## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,
ex rel DAVID LaCOURSE,

     Plaintiff-Relator,

-vs-

SIBLEY LIMESTONE, LLC, a Michigan limited liability
company, MICHIGAN ROADS, LLC, a Michigan limited
liability, AJAX PAVING INDUSTRIES, INC., a Michigan
corporation, formerly d/b/a DAN'S EXCAVATING, INC.,
AJAX MATERIALS CORP., a Michigan corporation d/b/a
DETROIT ASPHALT PAVING CO., DTE ENERGY CO.,
a Michigan corporation, DANIEL BRAKER, ALLAN YOUNG,
EDWARD JORDAN and TERRY EVERLY,
Jointly and Severally,

     Defendants.

_____/

Civil Action No.
Hon.
Magistrate

**MATTER FILED IN CAMERA
AND UNDER SEAL**

HERTZ SCHRAM PC
By:    Patricia A. Stamler (P35905)
Attorneys for Plaintiff-Relator
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302-0183
(248) 335-5000

_____/

### COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT (QUI TAM)
### AND DEMAND FOR JURY TRIAL

Relator David LaCourse, on behalf of himself and on behalf of the United States of

America, by and through his attorneys, HERTZ SCHRAM PC, hereby files this Complaint under

the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., the False Claims Recovery Act of 2009

("FERA"), 31 U.S.C. §§ 3729-3733,  and states as follows:

1

## PRELIMINARY STATEMENT

This is an action brought by Plaintiff David LaCourse to recover damages and civil penalties from Defendant corporations and their predecessor corporations, and the individual Defendants (collectively "Defendants") for knowingly making and presenting false statements and claims to the United States Environmental Protection Agency ("EPA," "United States," or the "Government") and/or Department of Transportation ("DOT") for purposes of: (1) inducing the Government to pay millions of dollars of costs, fees, awards, and/or incentives to Defendant DTE under contracts to operate the Sibley Limestone Quarry as a Class 3 special landfill which accepted illegal refuse from one or more of the other corporate Defendants in the Sibley landfill; and/or allowing Defendants Sibley Limestone and/or Ajax to remove inferior limestone from the Sibley Limestone Quarry for illegal use on a federally funded highway, and to perform various waste management, oversight, and remedial activities at this 207-acre site; and (2) concealing, avoiding, or decreasing their obligations to properly maintain the landfill, by dumping or accepting illegal refuse into the landfill, failing to remediate environmental toxins or failing to find remediation services for their prior misconduct.  In general, the false statements and claims made by the Defendants concerned their performance in the areas of health, safety, and environmental protection, particularly with respect to control of asbestos exposure, underground storage tanks, materials and wastes, waste management, and recycling of contaminated metals.

By such false statements and claims, Defendants misled the Government into believing that their performance in these areas was acceptable and satisfied the requirements for cost recovery and fees and rewards pursuant to the contracts between the Defendants, when in fact Defendants were knowingly, illegally, recklessly, in bad faith, imprudently, and/or negligently: (1) dumping or allowing to be dumped significant quantities of toxic materials and/or mixed

wastes in unauthorized locations; (2) exposing workers at and residents nearby the Sibley Quarry site to unnecessary and unlawful levels of toxic wastes, as more fully described below, through contact, proximity, contamination, inhalation, and ingestion, failing to monitor worker and residents' exposures properly, and failing to report toxic hazards to the employees, residents and authorities; (3) failing to report accurately to the proper authorities the levels of toxic contamination; and (4) failing to properly remove contamination in recycled materials, monitor for toxins prior to receipt of those materials for dumping in the landfill, or inform recipients of such contamination.  Further, by making these false statements and claims, the Defendants knowingly avoided and attempted to avoid their obligations to the United States to clean-up or to provide funding for the clean-up of contamination for which they were responsible.

Plaintiff (who is referred to herein as "Relator"), through his undersigned counsel, acting on behalf of and in the name of the United States, brings this civil action under the *qui tam* provisions of the False Claims Act, and FERA and hereby alleges as follows:

## JURISDICTION AND VENUE

1.      This action arises under 31 U.S.C. § 3729 *et seq.*, as amended in 2009 also known as the False Claims Act and FERA, to recover treble damages and civil penalties on behalf of the United States of America arising out of the Defendant's submission of fraudulent claims to the United States.

2.      31 U.S.C. § 3732 provides that this Court has exclusive jurisdiction over actions brought under the federal False Claims Act.  In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1345 and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 3732(a) of the Act which provides that "any action under 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act prescribed by § 3729 occurred."  The acts which are the subject of this action occurred in Southeast Michigan, including but not limited to the City of Warren, in the State of Michigan, within this judicial district.

4.     Under the False Claim Act, this complaint is to be filed *in-camera* and remain under seal for a period of at least sixty (60) days and shall not be served on defendants until the Court so orders.  The federal government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence.

5.     As required under § 3730(a)(2) of the federal Act, Relator has provided to the Attorney General of the United States and to the United States Attorney for the Eastern District of Michigan, prior to the filing of this Complaint, statements of all material evidence and information related to the Complaint.

6.     Relator is the original source of the information of the allegations contained in this Complaint.

## **PARTIES**

7.     Relator David LaCourse is a citizen and resident of the State of Michigan, United States of America, and brings this action on behalf of the United States of America and the State of Michigan.

8.     Defendant SIBLEY LIMESTONE, LLC, is a Michigan limited liability company with its principal place of business located in South Rockwood, Michigan and for all times relevant to this Complaint is doing business in this judicial district.

4

9.     Defendant MICHIGAN ROADS, LLC, is a Michigan limited liability company with its principal place of business located in Clarkston, Michigan and for all times relevant to this Complaint is doing business in this judicial district.

10.     Defendant AJAX PAVING INDUSTRIES, INC. is a Michigan for-profit corporation formerly d/b/a DAN'S EXCAVATING, INC., with its principal place of business located in Troy, Michigan and for all times relevant to this Complaint is doing business in this judicial district.

11.     Defendant AJAX MATERIALS CORP. is a Michigan for-profit corporation formerly d/b/a DETROIT ASPHALT PAVING CO., with its principal place of business located in Troy, Michigan and for all times relevant to this Complaint is doing business in this judicial district.

12.     Defendant DTE ENERGY CO. (DTE) is a Michigan for-profit corporation with its principal place of business located in Detroit, Michigan and for all times relevant to this Complaint is doing business in this judicial district.

13.     Defendant DANIEL BRAKER is for all times relevant to this Complaint an employee of Defendant DTE and is on information and belief a resident of Grosse Pointe, Michigan.

14.     Defendant ALLAN YOUNG is for all times relevant to this Complaint an employee of Defendant DTE and is on information and belief a resident of Riverview, Michigan.

15.     Defendant EDWARD JORDAN was for all times relevant to this Complaint an employee of Defendant DTE, and is on information and belief a resident of Ecorse, Michigan.

16.     Defendant TERRY EVERLY is for all times relevant to this Complaint an employee of Great Lakes Aggregates (parent company of Ajax and other companies listed, *see*:

5

http://www.greatlakesagg.net/Contacts.html).  Defendant is on information and belief a resident of Ohio.

## **GENERAL ALLEGATIONS**

17.     Relator commenced his employment with Defendant DTE Energy in 1980, and in 1999 he became the Site Coordinator at DTE's Sibley Quarry.

18.     From 1999 to present, Relator's immediate supervisor's name is Defendant Allan Young, Supervisor-Plant Operations.

19.     On or about November 19, 2007, Relator was transferred out of the Sibley Quarry to a different geographic location, approximately five miles from his original worksite, to the Trenton Channel Power Plant (TCPP).

20.     Relator's transfer to the TCPP occurred in direct response to his complaints regarding illegal dumping at the Sibley Quarry, failure to remediate toxic areas and other environmental hazards detailed below.

21.     Prior to his transfer, Relator's job duties included: site safety or site security, and interaction with governmental oversight agencies regarding environmental compliance.

22.     In 2001, Defendant DTE entered into a contract with Defendant Sibley Limestone, LLC ("Sibley Limestone").

23.     The term of the DTE/Sibley Limestone lease is for ten years, commencing January 1, 2001 and the lease governs mineral extraction between DTE and Sibley Limestone, LLC.

24.     The Defendant DTE's Sibley Quarry is a Type 3 (special) industrial landfill requiring a solid waste disposal license (SWDL) to operate.

25.     The SWDL must be renewed every five years.

6

26.     The SWDL requires Defendant DTE's submission of specific details on what materials are being dumped and where the dumping will occur during the term of the license.

27.     Defendant DTE's Sibley Quarry landfill is inspected on a monthly basis by Wayne County officials and quarterly by the Michigan Department of Environmental Quality (DEQ).

28.     In 2009, Defendant DTE was fined for improper filling of the landfill outside of the permitted fill area without the knowledge and without prior approval from the DEQ.

29.     Defendant DTE's application for solid waste disposal area operating license known as Detroit Edison Company; Sibley Quarry Landfill; Waste Data System No. 392616; License No. 9204 describes the facility as the Detroit Edison Company, Sibley Quarry Landfill, a Type 3 low hazard industrial landfill, consisting of 207 acres located at 801 Fort Street (also 502 Quarry Road) in Section 7, Township 4 South, Range 11 East, City of Trenton, Wayne County, Michigan.

30.     The designation of the Sibley Quarry Landfill as a Type 3 low hazard industrial landfill precludes the disposal of concrete with exposed metal rerod, and other debris (e.g. railroad ties, plastic and iron sewer pipes, leaking chemical barrels, road signage and road posts, untested clay fill and general metal refuse) from the I-75 Ambassador Gateway Project and the repaving project of I-75 from approximately West Road to the Fort Street interchange as more fully described below.

31.     The Resource Conservation and Recovery Act (RCRA) 42 U.S.C.6901 *et seq* gives the Environmental Protection Agency (EPA) the authority to control hazardous waste, including the generation, transportation, treatment, storage, and disposal of hazardous waste.

7

32.     RCRA also sets forth a framework for the management of non-hazardous solid wastes.

33.     The primary goals of RCRA are to: 1) protect human health and the environment from potential hazards of waste disposal; 2) conserve energy and national resources; 3) reduce the amount of waste generated; and 4) ensure that wastes are managed in an environmentally sound manner.

34.     RCRA was amended in 1984 by the Hazardous and Solid Waste Amendments (HSWA).

35.     RCRA is divided into subtitles.

36.     Subtitles C, D, and I set forth the framework for the EPA's comprehensive waste management programs.

37.     Subtitle C establishes a system for controlling hazardous waste from "cradle to grave," that is from its generation to its ultimate disposal.

38.     Subtitle D establishes a system for controlling solid waste, such as household waste.

39.     Subtitle I (established by HSWA) regulates toxic substances and petroleum products stored in underground tanks.

40.     The 1984 amendments to RCRA focused on waste minimization and phasing out the land disposal of hazardous waste as well as corrective action for toxic releases and increased EPA enforcement authority, created more stringent hazardous waste management standards, and developed a comprehensive underground storage tank program.

41.     The RCRA was amended again in 1986 and enabled the EPA to address environmental problems that could result from underground storage tanks storing petroleum and other hazardous substances.

42.     42 U.S.C. Sec. 6901 sets forth the Congressional findings supporting the statute and include the following relevant findings:

(a) Solid waste

The Congress finds with respect to solid waste--

(4) that while the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies, the problems of waste disposal as set forth above have become a matter national in scope and in concern and necessitate Federal action through financial and technical assistance and leadership in the development, demonstration, and application of new and improved methods and processes to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid waste disposal practices.

(b) Environment and health

The Congress finds with respect to the environment and health, that--

(1) although land is too valuable a national resource to be needlessly polluted by discarded materials, most solid waste is disposed of on land in open dumps and sanitary landfills;

(2) disposal of solid waste and hazardous waste in or on the land without careful planning and management can present a danger to human health and the environment;

(3) as a result of the Clean Air Act [42 U.S.C. 7401 et seq.], the Water Pollution Control Act [33 U.S.C. 1251 et seq.], and other Federal and State laws respecting public health and the environment, greater amounts of solid waste (in the form of sludge and other pollution treatment residues) have been created. Similarly, inadequate and environmentally unsound practices for the disposal or use of solid waste have created greater amounts of air and water pollution and other problems for the environment and for health;

9

(4) open dumping is particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and the land;

(5) the placement of inadequate controls on hazardous waste management will result in substantial risks to human health and the environment;

(6) if hazardous waste management is improperly performed in the first instance, corrective action is likely to be expensive, complex, and time consuming;

(7) certain classes of land disposal facilities are not capable of assuring long-term containment of certain hazardous wastes, and to avoid substantial risk to human health and the environment, reliance on land disposal should be minimized or eliminated, and land disposal, particularly landfill and surface impoundment, should be the least favored method for managing hazardous wastes; and

(8) alternatives to existing methods of land disposal must be developed since many of the cities in the United States will be running out of suitable solid waste disposal sites within five years unless immediate action is taken…

42.   Sec. 6901a. Congressional findings: used oil recycling

The Congress finds and declares that--…

(3) used oil constitutes a threat to public health and the environment when reused or disposed of improperly; and that, therefore, it is in the national interest to recycle used oil in a manner which does not constitute a threat to public health and the environment and which conserves energy and materials.

43.   Sec. 6902. Objectives and national policy

(a) Objectives

The objectives of this chapter are to promote the protection of health and the environment and to conserve valuable material and energy resources by—

(1) providing technical and financial assistance to State and local governments and interstate agencies for the development of solid waste management plans (including resource recovery and resource conservation systems) which will promote improved solid

10

waste management techniques (including more effective organizational arrangements), new and improved methods of collection, separation, and recovery of solid waste, and the environmentally safe disposal of nonrecoverable residues;…

(3) prohibiting future open dumping on the land and requiring the conversion of existing open dumps to facilities which do not pose a danger to the environment or to health;

(4) assuring that hazardous waste management practices are conducted in a manner which protects human health and the environment;…

(b) National policy

The Congress hereby declares it to be the national policy of the United States that, wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible. Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment.

44.    The RCRA defines key terms in the statute, see 42 U.S.C. 6903, including:

(3) The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

(5) The term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

(6) The term "hazardous waste generation" means the act or process of producing hazardous waste.

11

(7) The term "hazardous waste management" means the systematic control of the collection, source separation, storage, transportation, processing, treatment, recovery, and disposal of hazardous wastes.

(8) For purposes of Federal financial assistance (other than rural communities' assistance), the term "implementation" does not include the acquisition, leasing, construction, or modification of facilities or equipment or the acquisition, leasing, or improvement of land…

(14) The term "open dump" means any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 6944 of this title and which is not a facility for disposal of hazardous waste.

(26A) The term "sludge" means any solid, semisolid or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility or any other such waste having similar characteristics and effects.

(27) The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C. 2011 et seq.].

(28) The term "solid waste management" means the systematic administration of activities which provide for the collection, source separation, storage, transportation, transfer, processing, treatment, and disposal of solid waste.

(29) The term "solid waste management facility" includes—

(A) any resource recovery system or component thereof,

(B) any system, program, or facility for resource conservation, and

(C) any facility for the collection, source separation, storage, transportation, transfer, processing, treatment or disposal of solid wastes, including hazardous wastes, whether such facility is associated with facilities generating such wastes or otherwise.

(37) The term "recycled oil" means any used oil which is reused, following its original use, for any purpose (including the purpose for which the oil was originally used). Such term includes oil which is re-refined, reclaimed, burned, or reprocessed.

45.     Sec. 6905. Application of chapter and integration with other

Acts

(a) Application of chapter

Nothing in this chapter shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the Federal Water Pollution Control Act [33 U.S.C. 1251 et seq.], the Safe Drinking Water Act [42 U.S.C. 300f et seq.], the Marine Protection, Research and Sanctuaries Act of 1972 [16 U.S.C. 1431 et seq., 1447 et seq., 33 U.S.C. 1401 et seq., 2801 et seq.], or the Atomic Energy Act of 1954 [42 U.S.C. 2011 et seq.] except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts.

46.     Sec. 6924. Standards applicable to owners and operators of hazardous waste treatment, storage, and disposal facilities…

(w) Underground tanks

Not later than March 1, 1985, the Administrator shall promulgate final permitting standards under this section for underground tanks that cannot be entered for inspection. Within forty-eight months after November 8, 1984, such standards shall be modified, if necessary, to cover at a minimum all requirements and standards described in section 6991b of this title.

(x) Mining and other special wastes

If (1) solid waste from the extraction, beneficiation or processing of ores and minerals, including phosphate rock and overburden from the mining of uranium, (2) fly ash waste, bottom ash waste, slag waste, and flue gas emission control waste generated primarily from the combustion of coal or other fossil fuels, or (3) cement kiln dust waste, is subject to regulation under this subchapter, the Administrator is authorized to modify the requirements of subsections (c), (d), (e), (f), (g), (o), and (u) of this section and section 6925(j) of this title, in the case of landfills or surface impoundments receiving such solid waste, to take into account the special characteristics of such wastes, the practical difficulties associated with implementation of such requirements, and site-specific characteristics, including but not limited to the climate, geology, hydrology and soil chemistry at the site, so long as such modified requirements assure protection of human health and the environment.

47.    Sec. 6928. Federal enforcement

(a) Compliance orders

(1) Except as provided in paragraph (2), whenever on the basis of any information the Administrator determines that any person has violated or is in violation of any requirement of this subchapter, the Administrator may issue an order assessing a civil penalty for any past or current violation, requiring compliance immediately or within a specified time period, or both, or the Administrator may commence a civil action in the United States district court in the district in which the violation occurred for appropriate relief, including a temporary or permanent injunction.

(2) In the case of a violation of any requirement of this subchapter where such violation occurs in a State which is authorized to carry out a hazardous waste program under section 6926 of this title, the Administrator shall give notice to the State in which such violation has occurred prior to issuing an order or commencing a civil action under this section.

(3) Any order issued pursuant to this subsection may include a suspension or revocation of any permit issued by the Administrator or a State under this subchapter and shall state with reasonable specificity the nature of the violation. Any penalty assessed in the order shall not exceed $25,000 per day of noncompliance for each violation of a requirement of this subchapter. In assessing such a penalty, the Administrator shall take into account the seriousness of the violation and any good faith efforts to comply with applicable requirements.

(c)  Criminal penalties

Any person who--

(3) knowingly omits material information or makes any false material statement or representation in any application, label, manifest, record, report, permit, or other document filed, maintained, or used for purposes of compliance with regulations promulgated by the Administrator (or by a State in the case of an authorized State program) under this subchapter;

(4) knowingly generates, stores, treats, transports, disposes of, exports, or otherwise handles any hazardous waste or any used oil not identified or listed as a hazardous waste under this subchapter (whether such activity took place before or takes place after November 8, 1984) and who knowingly destroys, alters, conceals, or fails to file any record, application, manifest, report, or other document required to be maintained or filed for purposes of compliance with regulations promulgated by the Administrator (or by a State in the case of an authorized State program) under this subchapter;

(5) knowingly transports without a manifest, or causes to be transported without a manifest, any hazardous waste or any used oil not identified or listed as a hazardous waste under this subchapter required by regulations promulgated under this subchapter (or by a State in the case of a State program authorized under this subchapter) to be accompanied by a manifest;

(6) knowingly exports a hazardous waste identified or listed under this subchapter (A) without the consent of the receiving country or, (B) where there exists an international agreement between the United States and the government of the receiving country establishing notice, export, and enforcement procedures for the transportation, treatment, storage, and disposal of hazardous wastes, in a manner which is not in conformance with such agreement; or

(7) knowingly stores, treats, transports, or causes to be transported, disposes of, or otherwise handles any used oil not identified or listed as a hazardous waste under this subchapter--

(A) in knowing violation of any material condition or requirement of a permit under this subchapter; or

15

(B) in knowing violation of any material condition or requirement of any applicable regulations or standards under this chapter;

shall, upon conviction, be subject to a fine of not more than $50,000 for each day of violation, or imprisonment not to exceed two years (five years in the case of a violation of paragraph (1) or (2)), or both. If the conviction is for a violation committed after a first conviction of such person under this paragraph, the maximum punishment under the respective paragraph shall be doubled with respect to both fine and imprisonment.

(e) Knowing endangerment

Any person who knowingly transports, treats, stores, disposes of, or exports any hazardous waste identified or listed under this subchapter or used oil not identified or listed as a hazardous waste under this subchapter in violation of paragraph (1), (2), (3), (4), (5), (6), or (7) of subsection (d) of this section who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more than $250,000 or imprisonment for not more than fifteen years, or both. A defendant that is an organization shall, upon conviction of violating this subsection, be subject to a fine of not more than $1,000,000.

(f) Special rules

For the purposes of subsection (e) of this section--

(1) A person's state of mind is knowing with respect to--

(A) his conduct, if he is aware of the nature of his conduct;

(B) an existing circumstance, if he is aware or believes that the circumstance exists; or

(C) a result of his conduct, if he is aware or believes that his conduct is substantially certain to cause danger of death or serious bodily injury.

(2) In determining whether a defendant who is a natural person knew that his conduct placed another person in imminent danger of death or serious bodily injury--

(A) the person is responsible only for actual awareness or actual belief that he possessed; and

16

(B) knowledge possessed by a person other than the defendant but not by the defendant himself may not be attributed to the defendant;

Provided, that in proving the defendant's possession of actual knowledge, circumstantial evidence may be used, including evidence that the defendant took affirmative steps to shield himself from relevant information.

(g) Civil penalty

Any person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation.

48.     Sec. 6929. Retention of State authority

Upon the effective date of regulations under this subchapter no State or political subdivision may impose any requirements less stringent than those authorized under this subchapter respecting the same matter as governed by such regulations, except that if application of a regulation with respect to any matter under this subchapter is postponed or enjoined by the action of any court, no State or political subdivision shall be prohibited from acting with respect to the same aspect of such matter until such time as such regulation takes effect. Nothing in this chapter shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations. Nothing in this chapter (or in any regulation adopted under this chapter) shall be construed to prohibit any State from requiring that the State be provided with a copy of each manifest used in connection with hazardous waste which is generated within that State or transported to a treatment, storage, or disposal facility within that State.

49.     Pursuant to 42 U.S.C. 6931, the federal government appropriates millions of dollars per annum to be used for grants to the States for purposes of assisting the States in the development and implementation of authorized Sate hazardous waste programs.

50.     40 C.F.R. 261.1 *et seq.* defines hazardous waste very broadly and sets forth a catch-all provision that if a material is not specifically defined as a solid waste or hazardous waste, it is still a hazardous waste for purposes of these sections if:

    (i)      In the case of sections 3007 and 3010, EPA has reason to believe that the material may be a solid waste within the meaning of section 1004(27) of RCRA and a hazardous waste within the meaning of section 1004(5) of RCRA; or

    (ii)     In the case of section 7003, the statutory elements are established.

40 C.F.R. 261.1

## VIOLATIONS OF THE MIGRATORY BIRD ACT

51.    Defendant DTE's Sibley Quarry was deemed a certified wildlife habitat area in 2004.

52.    In 2004, Defendant DTE received an award for International Corporate Habitat of the Year.

53.    Relator was instrumental in working with other staff at Defendant DTE to create the wildlife habitat area within the Sibley Quarry and in securing the wildlife habitat certification.

54.    Two landowner tax incentive programs were passed as part of the Farm Bill.  One program was originally introduced as the Endangered Species Recovery Act.  The tax incentives apply to "qualified conservation contributions" which, under Section 170(h) of the Tax Code must meet one of the following "conservation purposes" tests:

    a.     The preservation of land areas for outdoor recreation, or the education of the general public;

    b.     The protection of a relatively natural habitat of fish, wildlife, or plants or similar ecosystems;

    c.     The preservation of open space for the scenic enjoyment of the general public, or pursuant to a clearly delineated governmental policy, which will yield a significant public benefit; and

    d.     The preservation of a historically important land area or a certified historic structure.

53.    The Endangered Species Recovery Act provides tax incentives to, among others, private landowners who voluntarily enter into agreements to protect habits of endangered and threatened species.

18

54.     Tax credits are realized by eligible landowners who enter into a conservation easement for habitat protection, or a habitat protection agreement that provides restoration of habitat for listed species.

55.     Easements may be held by the appropriate Secretary, the Secretary of Agriculture, or a State, either perpetuity or, under some circumstances for not less than 30 years.

56.     The provision excludes from tax liability, federal cost share programs to private landowners under the Partners for Fish and Wildlife Program; the Landowner Incentive Program, the State Wildlife Grants Program, and the Private Stewardship Grants Program.

57.     Defendant DTE's Sibley Quarry, as a certified wildlife habitat falls within the Endangered Species Recovery Act.

58.     Relator maintains that Defendant DTE received significant tax incentives to have the Sibley Quarry deemed a wildlife habitat.

59.     In the late spring or early summer of 2006, consistent with prior years, swallows built their nest sites along the ash hauling road within the Sibley Quarry.

60.     The ash is dumped in the Quarry from a number of coal burning power plants.

61.     The ash accumulates into walls which make an ideal surface for the swallows to create their nesting holes.

62.     In late spring-early summer 2006, Relator, who was intimately familiar with the wildlife habitat in the Quarry, instructed the landfill workers stationed at the Sibley Quarry not to disturb the swallows' nesting sites.

63.     In 2006, a new ash dump was being expanded at the Sibley Quarry. Consequently, thus it was not its normal length or width.

19

64.     As a result, the ash disposal trucks occasionally had to wait until room was available in the ash dump area to complete their ash dumps.

65.     Although the occasional delays lasted only a matter of minutes, Defendant DTE management raised complaints about the turnaround time for the dump trucks and discussed the desire to push the ash walls back to make room for more trucks to reduce the turnaround time.

66.     Relator opposed disturbing the ash walls with Defendant DTE management.

67.     Relator specifically told Defendant Young, that the nesting swallows were protected during the nesting period by the Migratory Bird Act (16 U.S.C. 703-712) and that Defendant DTE employees would have to wait a few weeks until the nesting season was over to alter the ash walls.

68.     On or about the last two weeks of June or early July, 2006, Relator was off of work on a four day weekend.

69.     Upon his return to work, Relator noticed that the ash walls in the quarry had been pushed back.

70.     Relator found numerous dead or dying adult and fledgling swallows.

71.     Relator questioned the Quarry equipment operator, Mike Bathgate, as to what occurred.

72.     Mr. Bathgate informed Relator that he was ordered by Defendant Young to widen the road into the ash dump.

73.     The widening of the ash dump walls resulted in the destruction of the swallows' nesting area.

74.     Prior to this incident, Defendant Young, Relator's supervisor, began questioning Relator in early May 2006 as to why he could not widen the dump area.

75.     Relator responded that absent an exception granted from the government to widen this dump, the birds at issue were protected during their nesting period.

76.     Defendant Young repeatedly raised his desire to widen the ash dump area road on a weekly basis.

77.     Relator estimates that approximately 200 swallows were illegally killed in 2006.

## GROUND WATER CONTAMINATION

78.     By the end of 2006, Defendant DTE had completed a multi-million dollar project to install a hydrogen peroxide distribution system and pump house.

79.     Defendant DTE's Sibley Quarry discharges approximately two million gallons of water per day into the Detroit River.

80.     By May 2007, Relator observed a large wet spot just south of the new pump station and he observed this area for several days and noted the wet area did not dry.

81.     Relator suspected that there was a serious leak in the pump system on or about May 2007.

82.     Relator reported his concerns to DTE's management, Defendants Young and Jordan and Mr. Chuey.

83.     Relator's report led to a discovery that the pond wall next to the pump station was in fact leaking.

84.     The repairs to the pump station exceeded $250,000.

85.     Prior to engaging in the necessary repairs, Relator was told by DTE management, Nick Chuey, to just cover the wet spot with a stone or to cover the wet area with clay.

21

86.     Relator disregarded the suggested *solutions* (which were in reality directions to cover-up the problem) and continued to raise his concerns about the environmental hazards to Mr. Chuey.

87.     On or about June 2007, Relator went on a medical leave for his neck and returned to work on or about mid-August 2007.

88.     Upon his return to work, Relator observed that not much progress had occurred with repair of the leak and he revisited the issue with DTE management Defendants Young and Jordan.

89.     On or about September 5, 2007, Relator resumed conducting well tests near the pond site.

90.     On or about early November 2007, in order to comply with environmental regulations, Defendant DTE learned that the ponds would have to be sealed and the cost of this repair was going to be somewhere between $250,000 - $500,000.

91.     Shortly after the cost of the repair was revealed within Defendant DTE, Relator learned that he was being removed from his work station and that he was being replaced by his Supervisor, Defendant Young.

92.     Defendants retaliated against Relator because he raised various environmental concerns, including the repair of the pump station.

93.     To Relator's knowledge, Defendants did not clean-up the toxic leak area.

## UNDERGROUND PETROLEUM STORAGE TANK

94.     In the fall of 2006, Defendant DTE's management, pursuant to an agreement with Defendant Ajax Paving Industries, Inc., allowed Ajax to clear a large area of brush in the Sibley Quarry for use as storage of Ajax's paving equipment.

22

95.     On or about October 2006, Relator, as part of his job responsibilities, inspected the cleared brush area.

96.     Relator noticed several small trees and brush that were left standing in an otherwise open field and, upon further inspection he found a vent pipe in the ground that was approximately six inches in diameter with a fill cap.

97.     The vent pipe and fill cap appeared to be a sign of an underground petroleum storage tank (hereafter UST).

98.     Upon locating this suspected UST, Relator contacted Defendant DTE's management Defendants Young and Jordan.

99.     On or about October, 2006, the environmental engineer for DTE examined the site and made specific findings which Relator later learned confirmed that there was approximately a 5,000 gallon petroleum storage tank in the ground.

100.    In addition, this UST still had about 1,000 gallons of petroleum product inside of it.

101.    During late 2006 into 2007, Relator discussed the issue of the UST and the need for its removal with Defendants Jordan, Young and Mr. Chuey.

102.    Sometime in early 2008, during an opportunity to return to the site, Relator noticed that the UST vent pipe that he previously observed was now gone, but the UST remained in the ground.

103.    Relator observed that the contents of the UST are still contained in the storage tank and/or have partially leaked into the ground.

104.   Relator extracted a sample of the liquid contained in the UST in March 2010 which shows a petroleum product still visible and the odor of the sample smells like petroleum products.

105.   Pursuant to 40 CFR 280.62(a), unless directed to do otherwise by the implementing agency, owners and operators must perform the following UST abatement measures:

(1)   Remove as much of the regulated substance from the UST system as is necessary to prevent further release to the environment;…

(4)   remedy hazards posed by contaminated soils that are excavated or exposed as a result of release confirmation, site investigation, abatement, or corrective action activities.  If these remedies include treatment or disposal of soils, the owner and operator must comply with applicable state and local requirements.

(5)   Measure for the presence of a release where contamination is most likely to be present at the UST site, unless the presence and source of the release have been confirmed in accordance with the site check required by Section 28.52(b) or the closure site assessment of 280.72(a)…

(6)   Investigate to determine the possible presence of free product, and begin free product removal as soon as practicable and in accordance with Section 260.64.

107.   40 C.F.R. 280.70 pertaining to out-of-service UST systems closure states, in part:

a.   When an UST system is temporarily closed, owners and operators must continue operation and maintenance of corrosion protection in accordance with Section 280.31 and any release detection in accordance with subpart D.  Subparts E and F must be complied with if a release is suspected or confirmed.  However, release detection is not required as long as the UST system is empty.  The UST system is empty when all materials have been removed using commonly employed practices so that no more than 2.5 cm (1 inch) of residue or .3% by weight of the total capacity of the UST system remain in the system.

b.   When a UST system is temporarily closed for 3 months or more, owners and operators must also comply with the following requirements:

i.   leave vent lines open and functioning; and
ii.   cap and secure all other lines, pumps, mainways, and ancillary equipment.

24

108.    The Environmental Protection Agency's federal regulation 40 C.F.R. 280.71(b) regarding permanent closure and change-in-service of a UST states:

> In order to permanently close a tank, owners and operators must empty and clean it out by removing all liquids and accumulated sludges.  All tanks taken out of service permanently must also be either removed from the ground or filled with inert solid material.

109.    Defendants DTE, Braker, Young or Jordan have not performed the requisite acts to permanently close the UST on DTE's Sibley Quarry site, nor has the other required remediation work occurred.

110.    40 CFR 280.74 requires the preparation and maintenance of UST closure records.

111.    Owners and operators of USTs must maintain records that are capable of demonstrating compliance with closure requirements under the law.

112.    The results of the excavation zone assessment required in 40 C.F.R. 280.72 must be maintained for at least 3 years after completion of permanent closure or change-in service in one of the following ways:

a.    By the owners and operators who took the UST system out of service.

b.    By the current owners and operators of the UST system site.

c.    By mailing these records to the implementing agency if they cannot be maintained as the closed facility.

113.    Relator does not believe any records of such activity have been maintained, particularly because these activities have not occurred.

## TOXIC TRANSFORMER

114.    From 2000 to 2009, Defendant Sibley Limestone conducted mining of limestone within the Sibley Quarry.

25

115.     In fall 2006, during the course of its mining work, Defendant Sibley Limestone was required to replace a large industrial electrical transformer.

116.     Shortly after Defendant Sibley Limestone installed a new transformer, Relator discovered that the old industrial electrical transformer was disposed of in a field behind an abandoned building within the Sibley Quarry.

117.     Relator contacted Defendant Terry Everly, Manager of Defendant Sibley Limestone Company, on several occasions requesting that he properly remove and dispose of the old transformer.

118.     Defendant Everly confirmed to Relator that he knew that the defunct transformer was on the site, that the transformer contained insulating oil and that its current PCB status was unknown.

119.     Relator also informed DTE management, Defendants Young and Braker that Defendant Sibley Limestone had disposed of the old transformer in the field near an abandoned building and that it had not been properly disposed of in violation of environmental laws.

120.     On or about September 2007, upon his return from medical leave, Relator noticed that the transformer was still lying in the field near the abandoned building.

121.     Relator gave additional notifications regarding the transformer to Defendants Young, Braker, Jordan and Mr. Chuey.

122.     Following Relator's removal from the site in November 2007, he specifically reminded Defendants Braker and Young, DTE management, of the presence of the electrical transformer.

123.     Relator observed that the transformer remained in the Sibley Quarry throughout 2008 and into mid-2009.

26

124.    On or about mid-2009, Relator learned that one of the contract workers for Defendant DTE, Mr. Derek Holbrook, demolished the electrical transformer in order to obtain scrap copper out of its interior and that he disposed of the remainder of the transformer in the ash landfill within the Sibley Quarry.

125.    Relator observed broken pieces of the transformer in the area where it was dismantled.

126.    Relator does not know what became of the roughly 210 gallons of oil inside the transformer.

**FERMI NUCLEAR RESEARCH BUILDINGS – ASBESTOS**

127.    Defendant DTE's Energy Fermi One Nuclear Research Buildings were abandoned on the Sibley Quarry site in the mid-1960s.

128.    Relator is aware that the nuclear fuel has been removed and that the site was last tested in 1994 for radioactivity.

129.    The buildings associated with this nuclear research plant were never demolished and the site was never properly cleaned.

130.    Defendant DTE management, specifically Defendants Young, Jordan and Braker were and are aware that these buildings contain large amounts of exposed asbestos and the buildings are collapsing in on themselves.

131.    The exposed asbestos in these research buildings has been and continues to be airborne.

132.    Relator mentioned on numerous occasions to Defendant DTE management Defendants Jordan and Young between the years 2002 through 2007 that these buildings should be demolished and that the former nuclear site needed to be cleaned up.

133.    Defendants Jordan and Young repeatedly told Relator that clean-up of these buildings would cost millions of dollars.

134.    Defendants Jordan and Young did agree to allow Relator to install "asbestos insulation" signage and "danger – do not enter" signs in 2005.

135.    On days when the wind is blowing strong out of the southwest direction, which commonly occurs along the Quarry's 300 feet walls, observers can readily see clouds of visible dust blowing from these abandoned asbestos-filled buildings.

136.    Residential homes and a public park are located approximately 80-100 yards away from these asbestos-filled abandoned buildings.

137.    Large storage tanks in the abandoned building and on the exterior of these abandoned buildings are visible.

138.    It is unknown to Relator if the storage tanks contain toxic chemicals as it is too dangerous to enter the buildings.

**HYDROGEN PEROXIDE DISTRIBUTION SYSTEM- CURRENT STATE**

139.    Defendant DTE is required to comply with the Clean Water Act and the Michigan Department of Environmental Quality Standards.

140.    In 2006, Defendant DTE was required to install and maintain the hydrogen peroxide injection system and pump station.

141.    The DEQ approved the system.  Defendant DTE's hydrogen peroxide injection system and pump station.

142.    DEQ was advised by DTE employees Mary Hanna and Brian Dantas, following the results from a study performed by RMT Inc., Ann Arbor that to obtain the best results in

reducing sulfides to comply with water quality regulations, hydrogen peroxide would be injected into the quarry's main sump pond at the base of the quarry via a floating barge.

143.    In early to mid-2009, the injection pumps on the barge failed.

144.    In early to mid-2009, the distribution system bringing the hydrogen peroxide to the main sump pond also failed due to the lack of maintenance.

145.    Defendant DTE determined that it was too expensive to repair and maintain this pump system.

146.    Defendant DTE decided to inject hydrogen peroxide only at the surface pond, via a back-up system which was originally designed to serve solely as an emergency back-up to the pump system.

147.    Defendant DTE's use of the back-up system as the primary operation of the hydrogen peroxide injection system was and is outside of the original development and engineering plans for this system.

148.    Relator maintains that the sulfides and/or other chemicals are improperly being discharged into the water and are not properly processed through the hydrogen peroxide distribution system as originally designed.

149.    In 2006, Defendant DTE contracted with RMT Inc. to conduct a study of water treatment options at the Quarry before the installation of the hydrogen peroxide water treatment system.

150.    RMT Inc.'s study found that the best method for water treatment was to introduce the hydrogen peroxide at the bottom of the Quarry sump pond.

151.    Defendant DTE's initial proposal to the Michigan Department of Environmental Quality (MDEQ), Inspector Lishba Varughese, passed environmental compliance premised upon the RMT study/plan.

152.    Permits were issued to Defendant DTE in 2007 based upon the representation that DTE would be injecting hydrogen peroxide in the Quarry's sump pond per the "Hydrogen Peroxide Treatment System Layout."

153.    After Defendant DTE obtained the required permits, DTE abandoned the Quarry sump pond platform following the first maintenance failure with the system on or about November, 2008.

154.    From on or about November 2008 to present, Defendant DTE has routinely injected the hydrogen peroxide at a surface level pond, using the secondary emergency injection system.

155.    Prior to his removal from the quarry, Relator was not aware of any effort by Defendant DTE to comply with legal requirements necessary to inject the hydrogen peroxide on the surface level pond instead of injecting it into the bottom of the Quarry's sump pond per the RMT plan.

156.    The injection system at the base of the Quarry has deteriorated to the point that it is now abandoned.

### SEWAGE PUMP STATION – ENVIRONMENTAL CONCERNS

157.    In approximately 2005, Relator was, consistent with his job responsibilities, investigating some of the abandoned buildings on site at the Quarry.

158.    Relator entered one of the abandoned buildings by removing a door on the building.

159.    Upon entry into this building, Relator located two large old industrial pumps and a very large deep well.

160.    Relator spoke to individuals on the site, including Defendant Young, about his discovery.

161.    Relator was unable to obtain information about this building's history from Defendant DTE.

162.    Relator conducted research and eventually obtained a drawing from the City of Trenton which shows that this site was an old sewer pump station which connects to buildings within an adjacent residential community.

163.    Relator continued to examine the building and the surrounding area of the building.

164.    Relator located a sump pond which contained a very large amount of liquid.

165.    Relator took a sample of the contents of the sump pond and determined that it was heavily contaminated with oil-based products.

166.    Relator immediately advised Defendant Jordan of DTE's environmental group about his findings.

167.    Thereafter, Defendants Jordan and Young, and Mr. Derek Holbrook and Relator inspected the site.

168.    Defendant DTE created a plan to pump out this well and to clean the building.

169.    All discussions regarding the proposed clean-up of this toxic area were halted in early to mid 2006 when Sharon Pfiefer, the former Plant Manager was replaced by Defendant Braker, current Plant Manager, Trenton Channel Power Plant.

170.     To date, no action has been taken to clean up this contaminated site except that a mound of dirt was placed in front of the door preventing entry into the building.

## GARAGE/FLOOR DRAIN ENVIRONMENTAL HAZARDS

171.     On or about spring of 2006, Defendants Young and Braker permitted the parent company of Defendant Sibley Limestone, Defendant Ajax Paving in contravention of the contract in place, to use the five-bay garage on site.

172.     Relator received a tip from Mr. Kenny Emmrick, Manager of Defendant Sibley Limestone, that workers for Defendant Ajax Paving were disposing used oil products down a floor drain in the garage.

173.     Relator inspected the garage and the drain at issue and he observed clear signs that the drain cover was inundated with oil.

174.     Relator noticed that the cover was removed and the floor drain was heavily contaminated with oil products.

175.     Relator then reported his observations to Defendants Jordan and Young.

176.     Relator observed Defendants Jordan and Young taking samples from the drain area and he witnessed their removal of obvious oil products during the sampling process.

177.     During this sampling process, Defendant Young informed Relator that he would be contacting Defendant Everly of Sibley Limestone about this dumping.

178.     On or about July of 2006, Defendant Young told Relator that Defendant Everly informed him that the floor drain was sealed off and the disposed products do not go anywhere.

179.     Relator was not satisfied with the explanation and suggested that the drain be pumped out to assure that the drain was in fact sealed off.

180.    Defendant Young informed Relator that the oil would be left in the drain and that this was not a "big deal."

181.    Relator observed that the sample Defendant Jordan took from the drain area came from a depth of approximately 1½ feet.

182.    No effort was ever made to verify whether the drain was actually sealed off and to Relator's knowledge the drain remains contaminated with oil based products.

183.    The drain may be connected to the city sewer system.

## THE AMBASSADOR GATEWAY BRIDGE

184.    In February 2008, the Michigan Department of Transportation (MDOT), with the financial support of the Federal Highway Administration (FHWA), began Phase 4 of the major construction project of the I-75 Ambassador Bridge Gateway Project (hereafter I-75 Gateway Project).

185.    The I-75 Gateway Project involved the closure of a 1.5 mile section of I-75 in Detroit, Michigan, spanning from Rosa Parks Blvd. to Clark Street.

186.    The I-75 Gateway Project is the largest single contract that MDOT has ever handled in the State.

187.    The total value of this contract was $230 million and was designed to increase traffic capacity and ease traffic congestion at the Detroit-Windsor border crossing and to decrease traffic volume on the city's streets.

188.    The I-75 Gateway Project included the reconstruction of the I-75 freeway from the Clark Street exit to 14th Street and the I-96 freeway from I-75 to the Warren Avenue exit.

189.    The project also included construction of new ramps for trucks and cars to the Ambassador Bridge, new ramps for access to the local community, reconstruction and

rehabilitation of more than 20 area bridges and improvements to the toll plazas at the Ambassador Bridge.

190.   Prior to the commencement of the I-75 Gateway Project, MDOT provided a detailed presentation to the City of Detroit, noting, inter alia, that the Ambassador Bridge is the "#1 U.S.-Canada commercial crossing" representing "23% of all surface trade between U.S. and Canada."

191.   As of 2006, the bridge was accommodating (2-way crossing) "11 million total vehicles" per annum, with "10 thousand trucks" per day.  ("Ambassador Bride/Gateway Project Power Point presentation to Detroit City Planning Commission, June 7, 2007).

192.   In 1997, the FHWA conducted an Environmental Assessment leading to FHWA's approval of the I-75 Gateway Project.

193.   The scope of the work on the I-75 Gateway Project was handled in four contract phases: Contract 1 – 2003 ($8.4 M); Contract 2 – 2003-2004 ($5.7 M); Contract 3 – 2005-2006 ($17.0 M); and Contract 4 – 2007-2009 ($176.6 M).

194.   On September 18, 2007, Midwest Analytical Services, Inc. released a report regarding the Ambassador Bridge Area, pertaining to samples taken North of Fort between 23rd and 24th; North of Fort Between 25th and West Grand Blvd; North of New Pump Station and 108" Pipeline.

195.   According to the Eastern Federal Lands Highway Division website,

There are a large number of contracting and procurement opportunities to support the programs of the Federal Highway Administration (FHWA).  Most FHWA contracting opportunities are managed by the Office of Acquisition Management, which awards and administers contracts, grants and cooperative agreements for the highway Research and Development program, technical and professional services, Intelligent Transportation Systems, data analysis, information systems, laboratory equipment, and training to support the adoption of new transportation

technologies.  The Office also runs a simplified acquisition program to purchase supplies, support services, information technology, and other equipment.

In addition, the FHWA provides contracting office support for the <u>Federal Motor Carrier Safety Administration</u> (FMCSA).
Contracting opportunities specifically for FHWA's <u>Federal Lands Highway program</u> include engineering services for planning and designing highways on Federally-owned lands, as well as construction contracts for building parkways and park roads, Indian reservation roads, defense access roads, and other roads on Federal lands.

FHWA contracting opportunities can be found at:

- **Office of Acquisition Management**
- **Procurement/Project Information for Eastern Federal Lands**
- **Procurement/Project Information for Central Federal Lands**
- **Procurement/Project Information for Western Federal Lands**

http://www.fhwa.dot.gov/doingbiz.htm

196.   On September 6, 2008, MDOT opened a one-mile section of I-96 from Rosa Parks Boulevard to I-94 in southwest Detroit.

197.   This portion of the overall I-75 Ambassador Bridge Gateway Project opened more than one month early.   http://www.michigan.gov/printerFriendly/0,1687,7-151-9621_11008_45614_49198_49199

198.   MDOT further reported that in September 2008 that as the

single-largest construction contract in MDOT's history, the Ambassador Bridge Gateway Project is a $170 million investment in Michigan's infrastructure that will increase capacity and ease traffic at the international Detroit-Windsor border crossing.  The project will reconstruct 1.5 miles of I-75, one mile of I-96, 18 ramps and 24 bridges. In addition, MDOT will build a state-of-the-art pedestrian bridge over I-75 and I-96, connecting east and west Mexicantown.  The entire project was originally scheduled for completion in late 2009, but MDOT officials expect a fall 2009 reopening.  <u>Id</u>.

199.    By January 12, 2009, almost a year after the start of construction, the MDOT I-75 Gateway Project was more than 70 percent complete and ahead of schedule.   MDOT had completed

> work on 1 mile of I-96 and 1 mile of I-75, along with 3 miles of new retaining and sound walls designed to minimize noise and enhance safety in neighborhoods adjacent to the freeway.   Of the ramps and bridges impacted by the project, MDOT has removed four structures, replaced two and rehabilitated seven.   Work on the remaining bridges and ramps are in progress and at various levels of completion.

> In addition to continuing construction on the current phase of the project, MDOT is preparing for the final two phases which involve constructing approaches to the Bagley Avenue pedestrian bridge and landscape work within the entire project corridor.   According to Johnson, these will be smaller contracts structured to encourage locally-owned businesses to participate in the bidding process that will take place later this year.

Id.

200.    The Gateway Construction Contractors included, Defndant Ajax Paving Industries, Inc.

201.    The National Environmental Policy Act (NEPA) requires federal agencies to integrate environmental values in their decisions through consideration of the environmental impacts of their conduct and to consider reasonable alternatives to the contemplated conduct.  42 U.S.C. 4321 et seq.

202.    NEPA establishes national environmental policy and goals designed to protect, maintain, and enhance the environment, and it provides a procedure for implementation of these goals within the federal agencies. NEPA also establishes the Council on Environmental Quality (CEQ).

203.     The Solid Waste Management Act Administrative Rules, promulgated pursuant to Part 115 of the Natural Resources and Environmental Protection Act, R 299.4325, governs Type III landfill operating requirements and states in pertinent part that:

(1) A type III landfill operation shall be under the immediate direction of a responsible individual.
(2) Access to a type III landfill shall be limited to those times when an attendant is on duty or when an alternative monitoring device is in use and shall be limited to those persons who are authorized to use the site for the disposal of solid waste…
(3) The unloading of solid waste shall be continuously supervised.

204.     All landfills must be operated under the direction of a responsible individual so as to ensure compliance with all governing environmental, safety, etc. statutes and regulations.

205.     Relator was the person responsible for the landfill, except during the period between June 1, 2007 to approximately late August 2007, when he was off on medical leave.

206.     Defendant Young served as the person responsible for the landfill oversight while Relator was on medical leave.

207.     Defendant Young also assumed responsibility for the landfill in November, 2007 to date, after Defendants removed Relator from the site.

208.     On or about June 1, 2007, Defendants Sibley Limestone/Ajax began dumping debris from the I-75 Gateway Project at the Sibley landfill.

209.     When Relator returned to work from his leave of absence in late August, 2007, he observed Ajax and Sibley Limestone illegally disposing of the I-75 Gateway Project refuse.

210.     Relator complained to Defendant's DTE management about the illegal dumping.

211.     During the summer of 2007, following Relator's return, Defendant DTE normally closed its landfill operations at 4 p.m. Monday through Friday.  However, Defendants Sibley

Limestone and Ajax were allowed to access the Quarry to dump illegal refuse until 6 or 7 p.m. during weekdays and on Saturdays.

212.    Defendant DTE and its employees Defendants Young and Braker allowed Defendants Sibley and Ajax to dump debris into the landfill from the I-75 Gateway construction project.

213.    Defendant DTE's decision to allow Defendants Sibley Limestone and Ajax access after normal hours was made by Defendants Young and Braker.

214.    In May 2007, Defendant Young informed Relator that the Sibley Quarry would be receiving concrete refuse removed from the I-75 expressway from various sub-contractors of Defendant Ajax Paving.

215.    Relator expressed concerns about the receipt of the concrete refuse and documented his concerns in compliance reports dated May 30, 2007, June 29, 2007 and September 24, 2007.

216.    The illegal disposal of the I-75 expressway refuse commenced in May 2007.

217.    Many of the items delivered for disposal were not legally permitted to be dumped in a Class 3 (special) landfill such as the Sibley Quarry.

218.    Relator was concerned with the disposal of the following categories of materials:

- Concrete with exposed re-rod (metal)

- Plastic drain pipes

- Sewer pipes

- Iron

- Clay

- Construction debris (including metal and plastic road signs, hazard cones, etc.)

- Well over 1000 cubic yards of inert material, without the requisite notification to DEQ or securing of the required special DEQ permit.
- Railroad ties

- Other metals, buckets, cans, metal pipes

- Barrels, some with leaking fluids oozing from them

219.   Defendant DTE's Trenton Channel Power Plant (TCPP) policies and procedures governed DTE and Sibley Quarry.

220.   Although the Sibley Quarry is physically five miles apart from the TCPP, the entities are considered one for administrative purposes.

221.   The TCPP policies state in key part, "Only approved materials should be dumped in the landfill.  The only approved materials are ash from River Rouge, Trenton Channel and Wyandotte; concrete **(no re-rod allowed)**, natural clean soils, brick and asphalt.  **Any other materials should not be dumped in the Sibley Quarry.**"  (Emphasis added).

222.   Michigan DEQ regulations required that it be notified whenever more than 1000 cubic yards of inert materials were dumped at the landfill.

223.   Defendants DTE, Braker and Young were aware of this regulation.

224.   Relator was advised by Defendant Young that "it wasn't necessary" to follow this notice regulations.

225.   Much of the expressway refuse dumped into the Sibley Quarry were dumped into areas that were not designated as a "landfill" per DTE's landfill permit.

226.   R299.4114 Inert materials defines inert materials to include:

"(d) Construction brick, masonry, pavement, and broken concrete that is reused for fill, riprap, slope stabilization, or other construction if all of the following conditions are met:
….
        ii.     The material does not include exposed reinforcing bars or other construction and demolition waste.

      iii.    The owner or operator of a site that is intended to receive more than 1,000 cubic yards of construction, brick, masonry, pavement and broken concrete notifies the director or his or her designee by submitting a form this is provided by the director.

227.    Defendant Young told Relator that if DEQ or the County ever questioned him as to why DTE was taking such a large amount of concrete that he was to give the DTE official position would be that *the concrete was being used to construct a new road to a new dump area and to stabilize the slope*.

228.    Defendant DTE did use some of the concrete debris for this purpose but this use was illegal because the concrete contained exposed re-rod and other unapproved materials.

229.    Relator learned from Defendant Young (with the approval of Defendant Braker) that Defendant DTE was accepting this hazardous waste from the I-75 Gateway Project because Defendant Ajax Paving was performing paving projects on the expressway.

230.    Per Defendant Young, DTE *helped* Ajax Paving dispose of the debris removed from I-75 so Ajax would buy more limestone from the Quarry for the paving project which, in turn, would increase DTE's *royalties.*

231.    Relator notified the Wayne County Inspector in May 2007 during a monthly inspection of the Quarry about his concerns regarding the improper dumping of the I-75 Gateway debris.

232.    The Wayne County Inspector instructed Defendant DTE, through Relator, to remove all metals and stated to cease dumping of metals and other debris from the I-75 Gateway Project.

2:10-cv-14344-AC-PJK   Doc # 1   Filed 10/28/10   Pg 41 of 50   Pg ID 41

233. Relator told Defendant Young that the Wayne County Inspector instructed Defendant DTE to remove all metals and to cease dumping of metals and other debris from the I-75 Gateway Project into the Quarry.

234. Relator observed that Defendant DTE did not remove the I-75 debris and continued to allow Defendants Ajax and Sibley Limestone to illegally dump debris from the I-75 Gateway Project into the Sibley Quarry.

235. In September 2007, Relator observed that heavy dumping of the expressway construction debris was continuing.

236. In September 2007, the problem of illegal dumping became severe and included leaking barrels.

237. Relator barred Defendants Ajax and Sibley Limestone from entering the Quarry to dump refuse from the I-75 project.

238. Relator met with the President of Defendant Ajax regarding his concerns about the illegal dumping.

239. Thereafter, the dumping stopped for approximately two weeks.

240. On or about October 2007, Relator met with Defendant Young to address the illegal dumping matter.

241. Defendant Young ignored Relator's concerns and instructed Relator to continue to allow Defendants Ajax and Sibley Limetone access to the Quarry to dump the debris from the expressway project.

242. The stone quarried at Sibley was and is limestone.

243. Limestone is a key ingredient in concrete.

244.    In order for limestone to be used in highways or state roads, it must be DOT certified.

245.    Limestone has many different quality levels, depending on its level of purity or impurity.

246.    The limestone produced at the Sibley Quarry is of a lower quality and did not, and does not meet the federal specifications for use in highways.

247.    The limestone from Sibley Quarry has never been certified by the DOT for use in roads.

248.    During Relator's tenure, several managers from Defendant Sibley Limestone, including Mike Smith, Kenny Emmerick, Defendant Everley and Stanley Ostrowski, informed him that the grade of limestone from Sibley "does <u>not</u>" meet the required quality standards of DOT.

249.    It was common knowledge that the limestone produced at Sibley Quarry did not meet the federal specifications for use in road or highway construction.

250.    The limestone produced at Sibley is of inferior quality and, therefore, is much less expensive than the higher grade limestone approved for use in highway concrete.

251.    On or about May, 2007, and dates thereafter, Defendants Braker and Young told Relator that Defendant Ajax was removing limestone from the Sibley Quarry for use in the concrete for the Ambassador Gateway Project I-75 repaving project.

252.    In exchange for allowing Defendants Ajax and Sibley Limestone to dump the debris from the I-75 concrete removal, Defendant Ajax agreed to purchase limestone from Defendant DTE's Sibley Quarry for use in the highway repaving project.

42

253.     On or about late August, 2007, and dates thereafter, Relator observed Defendant Ajax trucks dumping concrete removed from I-75 into the Quarry, and then loading its dump trucks with limestone from the Quarry.

254.     Relator believes, based on Defendant Young's statements, that the limestone that was removed from the Sibley Quarry was used in the concrete for the repaving of I-75.

255.     Type 3 landfills are required to charge the entity dumping materials in its landfill at a 21 cent tipping charge per each ton of material dumped. This is also known as a "landfill closure fee."     http://www.legislature.mi.gov/(S(2dqt41nenffbqqaqrplkmbaa))/mileg.aspx?page=getobject&objectname=mcl-act-451-of-1994.

256.     This tipping charge is charged for the anticipated event; when landfills are eventually closed.

257.     These funds are then available to maintain, inspect, monitor, etc. the landfill sites.

258.     The State of Michigan collects the tipping charges and holds these payments until closure of the landfill occurs.

259.     Relator knows that at the end of each quarter, the Quarry was and is required to prepare a document entitled: Quarterly Landfill Dumping.

260.     This report is prepared by Nick Chuey and/or Dennis Leonard, Defendant DTE employees.

261.     The Quarterly Landfill Dumping Report states the amount of materials dumped in the landfill (by the ton) for the quarter.

262.     Payment is calculated by the following formula: number of tons of material times 21 cents.

263.    Defendant DTE's quarry then makes the requisite payment to the State of Michigan.

264.    Relator knows that in 2007 the Sibley Quarry accepted millions of tons of the I-75 and Ambassador Bridge material based on the square feet of the area filled and square feet of the area with the tainted concrete debris.

265.    Defendant DTE's Environmental Engineer for TCPP, Nick Chuey, was responsible for the completion of the mandatory DEQ completion form.

266.    Mr. Chuey did not complete the mandatory DEQ declaration confirming the receipt of 1000 or more tons of inert material.

267.    Mr. Chuey also failed to pay the mandatory tipping charges for the disposal of these materials.

268.    Relator is not aware of any basis for an exception to payment of the tipping charges for the disposal of refuse from the I-75 Ambassador Gateway Project.

269.    Throughout Relator's employment, the Sibley Quarry had always paid the tipping fee for the tonnage of refuse disposed there.

270.    Relator believes that millions of tons of construction waste from the I-75 construction were dumped during roughly six months in 2007; and from on or about May 2007 to on or about November 2007.

**ILLEGAL DISPOSAL OF LEAD PIPES INTO THE SIBLEY QUARRY**

271.    On or about spring 2007, Relator observed the adjacent property owner's employees cut up lead pipes and dispose of them into the pond located on both properties.

272.    Relator advised DTE management verbally and via e-mail with the photos attached showing this illegal activity.

44

273.    DTE management ignored this illegal disposal and told Relator that i*f we watch them too close, they'll watch us too close.*

274.    The pond now contains lead pipes.

275.    The water from this pond flows into the ground water table.

### COUNT I
### FALSE CLAIMS ACT – VIOLATION OF THE MIGRATORY BIRD ACT
### AS TO DEFENDANTS DTE AND YOUNG

276.    Relator incorporates by reference the allegations contained in Paragraphs 1 though 275 of this Complaint.

277.    Defendant DTE knowingly presented or caused to be presented to the EPA false and fraudulent claims for payments, costs and compensation, in contravention of their certifications to the EPA for the administration, operation and maintenance of the Sibley Quarry landfill, as such claims pertained to the protection of Migratory Birds in a certified wildlife habitat.  These claims were false and fraudulent, and contained and were based upon the false statements and representations described in this Complaint in Paragraphs 51 to 77, which is incorporated by reference herein for all purposes; and were further based upon false records containing such false statements and representations.

278.    Defendants DTE and Young knowingly presented, or caused to be presented, to the United States Government for payment or approval, false or fraudulent claims, these claims being the above described requests for payments, and statements and certifications submitted to obtain such payments; each such instance being in violation of 31 U.S.C. § 3729(a)(1).

279.    Defendants DTE and Young knowingly made or used, or caused to be made or used, false records and statements to get false or fraudulent claims paid or approved by the United States Government, such records and statements being further described in this

45

Complaint in Paragraphs 51 to 77, which is incorporated by reference herein for all purposes; each such instance being in violation of 31 U.S.C. § 3729(a)(2).

280.    As a result of the conduct of Defendants, as described in this Complaint, the United States suffered actual damages.

## COUNT II
## FALSE CLAIMS ACT –DUMPING OF TOXINS IN UNAUTHORIZED DISPOSAL SITES AND CONTAMINATION OF LANDFILL

281.    Relator incorporates by reference the allegations contained in Paragraphs 1 though 280 of this Complaint.

282.    Defendants knowingly presented or caused to be presented to the EPA and/or DOT false and fraudulent claims for payments, costs, compensation, and awards under their contracts with EPA and/or DOT for the administration, operation and maintenance of the Sibley Quarry, as such claims pertained to the contamination of the Quarry ground, water, air, and other locations at the Quarry site, with toxic and/or mixed wastes.  These claims were false and fraudulent, and contained and were based upon the false statements and representations described in this Complaint, Paragraphs 78 to 183 and 271 to 275, which is incorporated by reference herein for all purposes; and were further based upon false records containing such false statements and representations.

283.    Defendants knowingly presented, or caused to be presented, to the United States Government for payment or approval, false or fraudulent claims, these claims being the above described requests for payments, and statements and certifications submitted to obtain such payments; each such instance being in violation of 31 U.S.C. § 3729(a)(1).

284.    Defendants knowingly made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States

Government, such records and statements being described in Paragraphs 78 to 183 and 271 to 275 to this Complaint, which is incorporated by reference herein for all purposes; each such instance being in violation of 31 U.S.C. § 3729(a)(2).

285.    As a result of the conduct of the Defendants as described in the Complaint, the United States suffered actual damages.

## COUNT III
## FALSE CLAIMS ACT – THE REMOVAL AND USE OF
## INFERIOR LIMESTONE FOR HIGHWAY CONSTRUCTION

286.    Relator incorporates by reference the allegations contained in Paragraphs 1 though 285 of this Complaint.

287.    Defendants knowingly presented or caused to be presented to the DOT false and fraudulent claims for payments, costs, compensation, and awards under their contracts with DOT for the removal of limestone for use in the I-75 Gateway paving project.

288.    These claims were false and fraudulent, and contained and were based upon the false statements and representations as set forth in Paragraphs 184 to 270 of this Complaint, which is incorporated by reference herein.

289.    Defendants knowingly presented, or caused to be presented, to the United States Government for payment or approval, false or fraudulent claims, these claims being the above described requests for payments, and statements and certifications submitted to obtain such payments; each such instance being in violation of 31 U.S.C. § 3729(a)(1).

290.    Defendants knowingly made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government, such records and statements being further described in Paragraphs 184 to 270 of

47

this Complaint, which is incorporated by reference herein for all purposes; each such instance being in violation of 31 U.S.C. § 3729(a)(2).

291.    As a result of the conduct of the Defendants as described in this Complaint, the United States suffered actual damages.

## COUNT IV
## THE REVERSE FALSE CLAIM

292.    Relator incorporates by reference the allegations contained in Paragraphs 1 through 291 of this Complaint.

293.    At all times pertinent to this Complaint, Defendants DTE, Sibley Limestone, Michigan Roads LLC, Ajax Paving or Ajax Materials had a present legal obligation pertaining to the administration, operation, maintenance or access to the Sibley Quarry, and under federal statutes, to implement, fund, finance, and otherwise provide or pay for the following:

a.    As to corporate Defendants DTE, Sibley Limestone or Ajax, a program for remedial and corrective action for the improper use of toxic transformer, garage floor drain, landfills;

b.    As to Defendant DTE, a program for remedial and corrective actions for the UST, ground water contamination, toxic transformer, Fermi Research buildings, hydrogen peroxide distribution system, sewage pump station, garage floor drain; and

c.    As to all Defendant corporations, a program for remedial and corrective actions for improper discharges of toxic materials into the Quarry.

294.    At all pertinent times to this Complaint, Defendant corporations had a present legal obligation pertaining to the administration, operation, maintenance or access to the Sibley Quarry, under federal statues, to implement, fund, finance, and otherwise provide or pay for the following:

a.    a program for remedial and corrective actions for the recycling program, including notification of recipients and retrieval of materials as necessary, revamping the recycling program, necessary cleanup of recipient sites; and

b.    a program for remedial and corrective actions for contamination and debris.

295.    Defendant corporations made and used false records and false statements to conceal, avoid, and decrease an obligation to pay or transmit money or property to the United States Government, as described in Paragraphs 78 to 275 in this Complaint, which are incorporated by reference herein; each such instance being in violation of 31 U.S.C. § 3729(a)(7).

296.    As a result of the conduct of the Defendant corporations, as described in this Complaint, the United States suffered actual damages.

## COUNT V - RETALIATION

297.    Relator incorporates by reference the allegations contained in Paragraphs 1 through 296 of this Complaint.

298.    On or about November 19, 2007, Defendant DTE transferred Relator out of his position located at the Sibley Quarry and relocated to the Trenton Channel Power Plant, in retaliation for raising various violations of the federal environment laws and federal transportation laws, including the illegal disposal of toxic waste; destruction of protected wildlife habitat and wildlife, failure to remediate polluted water, air and/or soil and the removal and use of inferior limestone for concrete used in the construction of a federal highway as more fully described in the preceding paragraphs.

299.    Defendant DTE's retaliation against Relator caused him injuries, including but not limited loss of status, loss of job duties, isolation, emotional distress, shock and embarrassment.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of himself and of the United States, requests judgment as follows:

A.    The United States is entitled to reimbursement of the funds obtained by Defendants as a result of fraudulent claims submitted to the United States.

B.    The United States is entitled to a civil penalty of $5,500 to $11,000, adjusted for inflation, for each false or fraudulent claim plus 3 times the damages sustained by the United States as a result of the false or fraudulent claim.  *See* 31 U.S.C. § 3729(a); 28 C.F.R. 85.3(a)(9)..

C.    Relator is entitled to an amount for reasonable expenses necessarily incurred, plus reasonable attorneys' fees and costs.  *See* 31 U.S.C. § 3730(d).

D.    Judgment against Defendant DTE for Relator two times the amount of any loss of back pay, future wage loss, past and future loss of benefits, compensatory damages, including mental damages and punitive damages, litigation costs and reasonable attorneys' fees.

E.    Relator is entitled to an order of partial distribution of the damages, penalties, assessments, and other relief awarded to the United States in an amount equivalent to a percentage of the entire recovery as set forth in 31 U.S.C. § 3730(d); such percentage distribution is in addition to Relator's recovery of expenses, attorneys' fees, and costs.

Respectfully submitted,

/s/ Patricia A. Stamler
HERTZ SCHRAM PC
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 335-5000
pstamler@hertzschram.com
P35905

Dated: October 28, 2010